**SCHIAN WALKER, P.L.C.**
3550 NORTH CENTRAL AVENUE, #1700
PHOENIX, ARIZONA 85012-2115
TELEPHONE: (602) 277-1501
FACSIMILE: (602) 297-9633
E-MAIL: ecfdocket@swazlaw.com
SCOTT R. GOLDBERG, #015082
CODY J. JESS. #025066
Proposed Attorneys for the Debtor

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br><br>THORNWOOD FURNITURE MANUFACTURING, INCORPORATED,<br><br>Debtor. | No. 2-10-bk-17750-RJH<br>No. 2-10-bk-17754<br><br>(Jointly Administered)<br><br>CHAPTER 11 |
| In re:<br><br>ALBACORE HOLDINGS, L.L.C.,<br><br>Debtor. | **DECLARATION OF CRAIG THORN IN SUPPORT OF MOTION FOR ORDER AUTHORIZING AND APPROVING DEBTOR-IN-POSSESSION FINANCING AND TO USE FUNDS CLAIMED AS CASH COLLATERAL** |

CRAIG THORN declares as follows:

1. I am the President of Thornwood Furniture Manufacturing, Incorporated, and the managing member of Albacore Holdings, L.L.C. (collectively, the "**Debtors**"). I own 70% of the outstanding membership interests in Albacore. I am the 70% shareholder in Thornwood.

2. This Declaration is submitted in support of the factual allegations contained in the *Motion for Order Authorizing and Approving Debtor-In-Possession Financing on an Interim and Final Basis and to Use Funds Claimed as Cash Collateral* (the "**Motion**").[1]

3. As the controlling officer and majority owner of the Debtors, I am familiar with the Debtors' general business and financial affairs. The statements set forth herein are true and accurate

---
[1] Capitalized terms used herein shall have the same meaning given to them in the Motion, unless otherwise defined herein.

to the best of my personal knowledge and if called to testify I would testify as stated herein.

4. Thornwood is one of the largest, nationally-recognized manufacturers of contemporary wood furniture in the United States. It operates from a 450,000 square foot state-of-the-art manufacturing and warehouse facility on a 22-acre campus near Sky Harbor International Airport in Phoenix, Arizona (the "**Property**"). Thornwood designs and manufactures furniture products both for the residential and commercial markets. Its residential products can be found nationwide in showrooms of well known furniture retailers.

5. Thornwood currently employs over 250 full and part-time employees. Thornwood began operating in 1987 with less than $1 Million in sales and a mere handful of workers selling only furniture for the residential market. By 2004, however, Thornwood was generating $60 Million in annual sales, and employed a workforce of approximately 850 employees. In 2007, Thornwood expanded into the commercial furniture market. Since 2007, the Debtor has placed commercially designed furniture into established commercial businesses as well as into small and large scale commercial building projects.

6. Albacore owns and operates the Property upon which Thornwood conducts its manufacturing and sales operations. Other than owning the Property, Albacore does not have any operations. Scott Thorn, Jeff Woods, Bob Lubold and I are the owners and officers of the Debtors. The business operations of the Debtors, including cash management systems, control, and human resources are fully integrated. As set forth more fully below, M&I is the principal lender to each of the Debtors.

7. Until the recent economic down-turn, Thornwood had been a very profitable company. From 1996 through 2005, Thornwood had net operating income of $34 Million dollars on sales of $500 Million. Also during this time period, and through the Filing Date, the Debtors were and remain solvent enterprises.

8. The sudden and severe recession has caused Thornwood to re-evaluate its business models and strategies that had been so successful in the past. Like many businesses, Thornwood was simply caught off-guard by the housing market's sudden and rapid collapse. Since the

initial phases of the recession however, Thornwood has stabilized its business operations, and has developed new models and strategies to accommodate present and near future market conditions. These strategies include the following:

    a. developing new residential product lines and aggressively placing them in the showrooms of both new and existing retail customers;

    b. forming new retail distribution channels for its products;

    c. expanding commercial business opportunities;

    d. fostering relationships with local custom installation companies to sell kitchen cabinets to builders throughout Arizona; and

    e. adding to its wholesale operations by entering into the retail furniture market by establishing "Maddies on Madison," a weekend-only factory furniture outlet situated on the Property in 50,000 square feet of warehouse space.

9. Furthermore, in keeping with the trend toward environmentally-friendly products, Thornwood has also developed the capability to produce "green" furniture made from core materials that contain no added formaldehyde, and that are Forestry Stewardship Counsel certified as coming from well-managed forests. Thornwood's "green" products appeal to both the "local manufacturing" and "American-made" movements that are currently popular with consumers.

10. M&I is the principal lender to each Debtor. On March 2, 2005, Albacore entered into two term notes (the "**Albacore Notes**") in favor of M&I; a fixed rate note in the original principal amount of $7 Million, and a variable rate note in the original principal amount of $3 Million. The Albacore fixed rate note has a present balance of about $6,213,775, and the Albacore variable rate note has a present balance of about $546,582. The combined Albacore debt is about $6,760,357 (the "**Albacore Debt**"). The Albacore Notes matured on March 2, 2010.

11. In November 2008, Thornwood signed a revolving note in the original principal amount of $7,000,000 (the "**Revolving Note**"), and a term note in the original principal amount of $739,100.27 (the "**Term Note**", and with the Revolving Note, the "**2008 Thornwood Notes**" and with

the Albacore Notes, the "**Notes**"), both in favor of M&I as payee. The present balance on the Revolving Note is $5,280,223, and the present balance on the Term Note is $574,593. The combined Thornwood debt is about $5,854,816 (the "**Thornwood Debt**"). The Thornwood Debt plus the Albacore Debt (the "**Indebtedness**") is about $12.5 million.

12. Upon information and belief, M&I alleges that the Thornwood Debt and the Albacore Debt are cross-defaulted and cross-collateralized. Upon information and belief, M&I claims that it has a lien in all of the real property and personal property that the Debtors own, and that Thornwood cannot use the proceeds of its accounts receivable without its consent or the consent of this Court since M&I claims that these proceeds are its "cash collateral."

13. In January 2009, M&I conducted formal appraisals of the Property and the Business Collateral. According to M&I's appraisers, the Property had a fair market value of almost $27 Million, while the Business Collateral had a fair market value of approximately $6.4 Million. The Debtors believe that the Indebtedness is about $12.5 million. Accordingly, the $12.5 Million Indebtedness is secured by $33 Million in assets. In May 2010, I received notifications from Thornwood vendors and customers that M&I was attempting to auction the Notes and the related collateral. In the materials received by Thornwood vendors, customers and competitors soliciting bids for the Notes, M&I claimed that the Property had an "as is" value of $21 Million.

14. The Debtors' ability to fulfill their working capital needs can be satisfied only if the Debtors are authorized to borrow under the DIP Financing and to use such proceeds, and cash collateral, to fund their operations. The credit provided under the DIP Financing will enable the Debtors to continue financing their operations, pay their employees, vendors, and suppliers, and operate their businesses in an orderly and reasonable manner to preserve and enhance the value of their assets and enterprise for the benefit of all parties-in-interest.

15. Moreover, the availability of credit under the DIP Financing and the use of cash collateral will provide employees, vendors, suppliers, and other parties with confidence in the Debtors that will enable and encourage them to resume ongoing credit relationships with the Debtors. The DIP

1 | Financing will enable the Debtors to make-up any cash shortfall during the bankruptcy cases as the Debtors' revenues and expenses likely will fluctuate each month during the pendency of these cases.

16. Before filing these bankruptcy cases, the Debtors sought financing from a variety of sources. Lenders willing to make new loans on commercial real estate in Arizona during the last few years have been few. Given the pervasive disruptions in the credit markets, financing from traditional lenders was simply not available to the Debtors. Financing from non-traditional lenders was easier to locate but the terms and conditions they imposed on the loans they offered were unacceptable or unaffordable. The DIP Lender was the only source of reasonable financing available to the Debtors.

17. The Debtors have engaged in significant efforts during the past two years to locate financing, and have concluded in their sound business judgment that the DIP Financing is absolutely necessary to sustain operations and to preserve their assets. The Debtors have exercised sound business judgment in determining that the DIP Financing is appropriate. The Debtors believe that the proposed terms of the DIP Financing are fair, reasonable, and adequate and do not transfer any substantial control over the Debtors' bankruptcy cases to the DIP Lender, which had no relationship prior to the Debtors. The various fees and charges required by the DIP Lenders under the DIP Financing are reasonable and appropriate under the circumstances.

18. I am informed that M&I will claim the revenue generated by the Debtors post-petition as its cash collateral. To date, M&I has not consented to the use of its purported cash collateral. As such, the Debtors request authority from this Court to use the cash collateral to pay critical expenses such as payroll, taxes, the purchase of goods, materials, and services, and to pay other reasonable expenses as they arise in the ordinary course of business. Without that consent, the Debtors will be unable to operate, and will be forced to liquidate its assets, which will cause the Debtors' 250 employees to lose their jobs.

19. The Debtors require the DIP Financing and use of cash collateral to fund their operations during the Budget period and thereafter. Having an assured cash flow from these sources will allow the Debtors to provide assurances to its various constituencies that they can pay their

obligations on a going forward basis, and will ultimately permit the Debtors to maximize the value of their assets for the benefit of all concerned, including M&I. Allowing the Debtors to incur the DIP Financing and use cash collateral will promote the filing and ultimate confirmation of a plan of reorganization that will pay all creditors, including M&I, in full.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: June 9th, 2010.

/s/ CRAIG THORN
Craig Thorn

COPIES of the foregoing
e-mailed this 9th day
of June, 2010 to:

Edward K. Bernatavicius, Esq.
U.S. Trustee's Office
230 North First Avenue, #204
Phoenix, Arizona 85003-1706
edward.k.bernatavicius@usdoj.gov

Brian Sirower, Esq.
Michael Migliaccio, Esq.
Jason Curry, Esq.
Quarles & Brady, LLP
Two North Central Avenue
Phoenix, Arizona 85004-2391
Attorneys for M&I Marshall & Ilsley Bank
brian.sirower@quarles.com
michael.migliaccio@quarles.com
jason.curry@quarles.com

/s/ JULIE LARSEN

140974.4