**SCHIAN WALKER, P.L.C**.
3550 NORTH CENTRAL AVENUE, #1700
PHOENIX, ARIZONA 85012-2115
TELEPHONE: (602) 277-1501
FACSIMILE: (602) 297-9633
E-MAIL: ecfdocket@swazlaw.com
DALE C. SCHIAN, #010445
CODY J. JESS, #025066
Proposed Attorneys for Debtors

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF ARIZONA**

| In re:<br><br>THORNWOOD FURNITURE MANUFACTURING, INCORPORATED,<br><br>Debtor.<br><br>In re:<br><br>ALBACORE HOLDINGS, LLC,<br><br>Debtor. | No. 2-10-bk-17750-RJH<br>No. 2-10-bk-17754-SSC<br><br>(Jointly Administered)<br><br>CHAPTER 11<br><br>**EMERGENCY MOTION FOR ORDER AUTHORIZING AND APPROVING (1) DEBTOR-IN-POSSESSION FINANCING ON AN INTERIM AND FINAL BASIS, AND (2) USE OF FUNDS CLAIMED AS CASH COLLATERAL** |
|---|---|

Pursuant to Bankruptcy Code §§ 105(a), 361, 363 and 364, and Bankruptcy Rule 4001, Thornwood Furniture Manufacturing, Incorporated ("**Thornwood**") and Albacore Holdings, LLC ("**Albacore**" and with Thornwood, "the "**Debtors**") submit this *Emergency Motion for Order Authorizing and Approving (1) Debtor-In-Possession Financing on an Interim and Final Basis, and (2) Use of Funds Claimed as Cash Collateral* (the "**Motion**"). As set forth below, the Debtors seek to obtain post-petition financing (the "**DIP Financing**") in the form of a $2 million line of credit ("**LOC**") from Invespro Partners, LLC ("**DIP Lender**") to be secured by (i) senior secured liens ("**Senior Secured Liens**") on all of the Debtors' prepetition and post-petition assets (the "**DIP Collateral**") to the extent that M&I Marshall & Ilsley Bank ("**M&I**") does not hold any valid or unavoidable liens on the above-mentioned assets, and (ii) priming liens ("**Priming Liens**") in all of the DIP Collateral to the extent that M&I holds unavoidable prepetition liens in the assets that comprise the DIP Collateral. The DIP

Collateral includes the real property that Albacore owns (the "**Real Property Collateral**") and the personal property assets that Thornwood owns (the "**Personal Property Collateral**"), except that the DIP Collateral does not include avoidance actions or their proceeds (collectively, the "**Avoidance Actions**"). The Debtors also seek to use in the ordinary course of business funds that the Debtors believe M&I will claim as its cash collateral as defined under the Bankruptcy Code ("**Cash Collateral**").

This Motion seeks emergency interim relief and then final relief pursuant to Bankruptcy Rule 4001(c)(2). Pursuant to Bankruptcy Rule 4001(c) (2), the Debtors request that the Court conduct an initial hearing (the "**Initial Hearing**") on an emergency basis and, thereafter, enter an interim order (the "**Interim Order**") approving, on an emergency basis, borrowing under the DIP Financing in the approximate amount of $600,000 to be used for the purposes set forth in Exhibit B until a final hearing (the "**Final Hearing**") can be conducted. The Interim Order and the funds distributed pursuant to it will be subject to the terms and conditions set forth below, namely that the distributed funds will accrue interest at the rate of 15% and will be secured by the Senior Secured Liens or the Priming Liens (collectively, the "**DIP Liens**") as the case may be. At least fourteen (14) days after service of the Motion, but as soon as practicable thereafter (the "**Interim Period**"), the Debtors request that the Court conduct a Final Hearing to approve the DIP Financing on a final basis and to authorize and approve all of the borrowings under the DIP Financing as more fully set forth on the term sheet (the "**Term Sheet**") attached hereto as Exhibit C. Accordingly, this Motion will be followed by an emergency motion (the "**Emergency Motion**") seeking an Interim Hearing and the entry of the Interim Order. Pursuant to Bankruptcy Rule 4001(c), the terms of the DIP Financing and the Terms Sheet are as follows:

1. DIP Lender: Invespro Partners, LLC.
2. Loan Amount: $2 million.
3. Commitment Fee: $100,000.
4. Exit Fee: none.
5. Interest Rate: 15%.
6. Prepaid Reimbursable Expenses: to be determined.

7. Prepaid Interest: six months.

8. Purpose: working capital and bankruptcy costs.

9. Collateral: Senior Secured Liens and Priming Liens in the DIP Collateral, excluding Avoidance Actions, and super-priority claim under Bankruptcy Code § 364(c)(1) subject to the Carve-Out.

10. Carve-Out: for approved fees of professionals ("**Professional Fees**") retained pursuant to Bankruptcy Code § 327 in the amounts set forth in a budget approved by DIP Lender.

11. Replacement Lien: to M&I, a replacement lien ("**Replacement Lien**") in the Debtors' post-petition assets limited to the same type and description of collateral that was subject to any valid and unavoidable prepetition lien of M&I; however, the Replacement Lien, in all respects, shall be junior and subordinate to the Priming Lien and the Carve-Out.

This Motion is supported by the attached Memorandum of Points and Authorities, the declaration of Craig Thorn filed at DE 22, and the attached Exhibits A through G.

DATED this 9th day of June, 2010.

SCHIAN WALKER, P.L.C.


By /s/ CODY J. JESS, #025066
    Dale C. Schian
    Cody J. Jess
    Proposed Attorneys for Debtors

## MEMORANDUM OF POINTS AND AUTHORITIES

I. STATEMENT OF FACTS.

    A. The Chapter 11 Filing.

On June 7, 2010 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "**Code**"). The Debtors are authorized to operate their businesses as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. This

Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this proceeding is proper pursuant to §§ 1408 and 1409. These cases are being jointly administered. The relief requested in this Motion is authorized by Bankruptcy Code §§ 105, 361, 363 and 364, and by Bankruptcy Rule 4001.

B. <u>The Debtors' Business Operations</u>.

1. Thornwood is one of the largest, nationally-recognized manufacturers of contemporary wood furniture in the United States. It operates from a 450,000 square foot state-of-the-art manufacturing and warehouse facility on a 22-acre campus near Sky Harbor International Airport in Phoenix, Arizona (the "**Property**").[1] *See* Exhibit A, which contains several photographs of the Property.

2. Thornwood designs and manufactures furniture products both for the residential and commercial markets. Its residential products can be found nationwide in showrooms operated by national retail distributors. Thornwood currently employs over 250 full- and part-time employees.

3. Thornwood began operating in 1987 with less than $1 million in sales and a mere handful of workers selling only furniture for the residential market. By 2004, however, Thornwood was generating $60 million in annual sales and employed a workforce of approximately 850 employees. In 2007, Thornwood expanded into the commercial furniture market. Since 2007, Thornwood has placed commercially designed furniture into established national businesses, as well as into small and large scale commercial building projects such as the Aria Tower in the New City Center, Las Vegas, Nevada. Recently, Thornwood has entered into commercial contracts with state and federal governmental entities.

4. Albacore owns and operates the Property upon which Thornwood conducts its manufacturing and sales operations. Other than owning the Property, Albacore does not have any operations or employees. Scott Thorn, Jeff Woods, Bob Lubold and Craig Thorn are the owners and officers of the Debtors. The business operations of the Debtors, including cash management systems,

---

[1] The Property and the Real Property Collateral describe the same real property. Likewise, the Business Collateral and the Personal Property Collateral describe the same personal property.

control, and human resources are fully integrated. Since at least 1997, the Debtors have operated as a single enterprise. As set forth more fully below, M&I is the principal lender to each of the Debtors.

5. Until the recent economic downturn, Thornwood had been a very profitable company. From 1996 through 2005, Thornwood had net operating income of $34 million dollars on sales of $500 million. Also during this time period, and through the Filing Date, the Debtors were and remain solvent enterprises. Despite the economic downturn, since 2005, the Debtors have paid to M&I $9 million, and were able to reduce the principal balances owed to M&I by about $4 million.

6. The Debtors are also solid corporate citizens. Thornwood has made substantial contributions to the Phoenix metropolitan community by donating 10% of its profits to charity. Thornwood has donated about $3.5 million to the Boys and Girls Clubs of Metropolitan Phoenix, Mercy Corps International, The Nature Conservatory, Habitat for Humanity, The Christian Children's Fund, the Crisis Nursery, and The American Red Cross.

7. The sudden and severe recession caused Thornwood to reevaluate the business models and strategies that had been so successful in the past. Like many businesses, Thornwood was overtaken by the housing market's sudden and rapid collapse. However, since the initial phases of the recession, Thornwood has stabilized its business operations and has developed new models and strategies to accommodate and capitalize upon present and future market conditions. These strategies include the following:

    a. developing new residential product lines and aggressively placing them in the showrooms of both new and existing retail customers;

    b. forming new retail distribution channels for its products;

    c. expanding commercial business opportunities, which have resulted in Thornwood's products being installed in the Aria Tower in the New City Center in Las Vegas and other major hotels and retail centers;

    d. fostering relationships with local custom installation companies to sell kitchen cabinets to builders throughout Arizona; and

e. adding to its wholesale operations by entering into the retail furniture market by establishing "Maddies on Madison," a weekend-only factory furniture outlet situated on the Property in 50,000 square feet of warehouse space.

8. Furthermore, in keeping with the trend toward environmentally-friendly products, Thornwood has also developed the capability to produce "green" furniture made from core materials that do not contain formaldehyde and that are certified by the Forestry Stewardship Counsel as having been made from wood generated from well-managed forests. Thornwood's "green" products appeal to many important and growing segments of the population.

9. While competition from China and from domestic suppliers posed considerable challenges to Thornwood's operations in the past, recent events have provided Thornwood with unique opportunities to improve its business operations substantially. For instance, the sharp economic downturn has eliminated all but a very few of Thornwood's domestic competitors. The absence of large scale manufacturers means that Thornwood is uniquely positioned to expand its retail customer base and to generate substantial business from smaller manufacturers that lack the capacity to produce furniture on a large scale basis. In addition, foreign competition, particularly from China, has diminished because of increased shipment costs and because the foreign products lack the quality and safety that exist in Thornwood's products. Market conditions favor Thornwood's return to sustained growth and profitability.

C. The Debtors' Capital Structure.

1. The Debtors' principal lender is M&I. Thornwood is a long-standing M&I customer and has paid and repaid millions of dollars to M&I since their relationship began approximately 20 years ago. The obligations at issue in this case are as follows: on March 2, 2005, Albacore entered into two term notes (the "**Albacore Notes**") in favor of M&I, a fixed rate note in the original principal amount of $7,000,000 with a maturity date of March 2, 2010, and a variable rate note in the original principal amount of $3,000,000 also due on March 2, 2010. The Albacore fixed rate note

///

has a present balance of about $6,213,775, and the Albacore variable rate note has a present balance of about $546,582. The combined Albacore debt is about $6,760,357 (the "**Albacore Debt**").

2. In November 2008, Thornwood signed a revolving note in the original principal amount of $7,000,000 (the "**Revolving Note**") and a term note in the original principal amount of $739,100.27 (the "**Term Note**" and with the Revolving Note, the "**2008 Thornwood Notes**" and with the Albacore Notes, the "**Notes**"), both in favor of M&I as payee. The present balance on the Revolving Note is $5,280,223, and the present balance on the Term Note is $574,593. The combined Thornwood debt is about $5,854,816 (the "**Thornwood Debt**"). The Thornwood Debt and the Albacore Debt (the "**Indebtedness**") total approximately $12.5 million.

3. M&I claims that the Albacore Notes are secured by two deeds of trust recorded on March 2, 2005, a third deed of trust recorded in October 2006, and an assignment of rents dated February 2, 2005 (the "**Assignment**"). Based upon these recorded documents, the Debtors do not dispute that M&I has a valid and unavoidable lien in the Property to secure, at the least, the Albacore Notes. The Debtors, however, dispute that M&I has a lien or a perfected lien on the business assets of Thornwood, including its equipment, inventory and accounts receivable (the "**Business Collateral**").

4. On March 2, 2005, Thornwood executed a blanket security agreement (the "**2005 Security Agreement**") in favor of M&I presumably to secure the Albacore Notes because it does not appear that credit was extended to Thornwood at this time. However, no Uniform Commercial Code Financing Statement was recorded to perfect any lien in the Business Collateral in 2005 or since. Presumably, M&I has discovered this omission and is now relying upon an old financing statement that it recorded in 2001 (the "**2001 Financing Statement**") to claim its 2005 lien as perfected. Although further research is required, the Debtors do not believe that the Uniform Commercial Code permits a financing statement to perfect a lien that would not yet come into being for another four years.

5. Not only did M&I neglect to record a financing statement in 2005 in conjunction with the 2005 Security Agreement, it also appears that M&I neglected to record a financing statement in 2008 in conjunction with the 2008 Thornwood Notes and also neglected to obtain a security agreement

in conjunction with those same notes. The absence of a 2008 financing statement and a 2008 security agreement is perplexing because M&I conditioned the 2008 Thornwood Notes upon its receipt of these documents. *See* Exhibit D. In the absence of these 2008 documents, M&I now alleges that the 2008 Thornwood Notes are secured and perfected by the 2005 Security Agreement and the 2001 Financing Statement. Although further research is required, the Debtors do not believe that a financing statement can perfect a lien that is first created years after a financing statement is recorded.

### D. M&I Is A Vastly Over-Secured Creditor.

1. In January 2009, M&I conducted formal appraisals of the Property and the Business Collateral. According to M&I's appraisers, the Property has a fair market value of almost $27 million. *See* Exhibit E, which contains the summary of the appraisal of the Property. In addition, the appraised fair market value of the Business Collateral was about $6.4 million. *See* Exhibit F. The Debtors believe that the Indebtedness is about $12.5 million. Accordingly, if M&I has an unavoidable lien in the Business Collateral, then the $12.5 million Indebtedness is secured by $33 million in assets, yielding an equity cushion of 64%. The proposed DIP Financing of only $2 million does not significantly diminish M&I's equity cushion.[2]

2. In May 2010, M&I attempted to auction the Notes and the related collateral through an auction site managed by Mission Capital Advisors. To participate in the auction process, M&I was obligated to provide an accurate description of the Notes and related collateral to prospective purchasers of the Notes. In its description, M&I claims that the Property has an "As Is" value of more than $21 million and that its loan-to-value ratio is about 50% -- so that M&I acknowledges an equity cushion of 50% without even considering the added value of the Business Collateral. When the value of the Business Collateral is considered, M&I's equity cushion only increases and approaches the 64% mentioned above. *See* Exhibit G.

///

---

[2] M&I alleges that all the Notes are cross-defaulted and cross-collateralized, so the Debtors are justified in collapsing all the debt and collateral in determining the equity cushion.

3. The equity cushion demonstrates the Debtors' contention that they are solvent enterprises, and that the filing of the bankruptcy cases was caused by temporary cash flow concerns and by the aggressive actions that M&I has pursued to liquidate its collateral despite its over-secured position, and despite the repercussions to the Debtors and to their 250 employees. Given the equity cushion, the integration of the Debtors' operations, and M&I's claim that its loans to the Debtors are cross-defaulted and cross-collateralized, it is likely that the Debtors will pursue a plan of reorganization that is a full payment plan and that treats the Debtors' operations as a single business even if their separate corporate identities are maintained.

E. Events Leading To The Bankruptcy Filing.

1. In January 2009, M&I declared the Notes in default. In March 2009, the Debtors and M&I entered into a forbearance agreement (the "**Forbearance Agreement**"), which was then subject to several amendments, the last of which expired on or about May 5, 2010. Since the Forbearance Agreement was executed only 14 months ago, M&I has acknowledged receiving more than $1 million from the Debtors during that time period. *See* Exhibit G.

2. Under the Forbearance Agreement, all of Thornwood's cash was swept by M&I each day and M&I advanced Thornwood funds for its operations. In early May 2010, without notice and prior to the expiration of the Forbearance Agreement, M&I swept the cash and dishonored checks to Thornwood's vendors. Two weeks later, M&I sought the *ex parte* appointment of a receiver without notice to Thornwood or to undersigned counsel, whom M&I knew the Debtors had retained. The Superior Court denied M&I's *ex parte* request for a receiver and set a hearing for June 15, 2010.

II. REQUESTED RELIEF.

1. The Debtors seek approval of the DIP Financing and use of cash collateral on an emergency basis during the Interim Period until a Final Hearing can be conducted. Exhibit B sets forth Thornwood's Budget for the Interim Period. Each expense on Exhibit B is necessary to maintain Thornwood's operations and to preserve the Debtors' relationship with its employees and critical vendors and suppliers. If Thornwood is unable to pay its employees and vendors, the Debtors will not be able to

operate, to procure new contracts, and their opportunity for a successful reorganization will have been irreparably harmed. The Debtors request authority to use the DIP Financing to account for and pay any shortfall that may occur during the Interim Period.

2. Both on an interim and final basis, the Debtors' ability to fulfill their working capital needs can be satisfied only if the Debtors are authorized to borrow under the DIP Financing and to use such proceeds, along with cash collateral, to fund their operations. The credit provided under the DIP Financing will enable the Debtors to continue financing their operations, pay their employees, vendors, and suppliers, and operate their businesses in an orderly and reasonable manner to preserve and enhance the value of their assets and enterprise for the benefit of all parties-in-interest. Moreover, the availability of credit under the DIP Financing will provide employees, vendors, and suppliers and other parties with confidence in the Debtors that will enable and encourage them to resume ongoing credit relationships with the Debtors.

3. Pursuant to Bankruptcy Code § 364(d)(4), if a debtor is unable to obtain credit under the provisions of § 364(c) of the Bankruptcy Code, a debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." Section 364(d)(1) of the Bankruptcy Code, which authorizes priming liens, provides that after notice and a hearing, a court may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if (a) the trustee is unable to obtain credit otherwise; and (b) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

4. Pursuant to § 364(d)(1), therefore, the Court can only authorize a Priming Lien if the Debtors are not able to obtain alternative financing and if adequate protection is given to the entity whose liens and security interests will be primed. Before filing these bankruptcy cases, the Debtors sought financing from a variety of sources. Lenders willing to make new loans on commercial real estate in Arizona during the last few years have been few. Given the pervasive disruptions in the credit markets, financing from traditional lenders was not available. Financing from non-traditional lenders

was easier to locate but the terms and conditions they imposed on the loans they offered were unacceptable or unaffordable. The DIP Lender was the only source of reasonable financing available to the Debtors. The declaration of Craig Thorn establishes that the Priming Lien is the only way in which new credit will be made available to the Debtors on reasonable terms.

5. A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by §§ 364(c) and (d) of the Bankruptcy Code. *In re Snowshoe Co.,* 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989). Thus, the evidence introduced at the Interim Hearing to consider the relief requested in the Interim Order will satisfy the requirement of §§ 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

6. Regarding the second condition that must be met to approve a Priming Lien, Bankruptcy Code § 361 provides that adequate protection is required only for the benefit of secured creditors and to protect them from any decline in the value of their interests in the collateral sought to be used or primed. *See United Savs. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 369-73 (1988) (the "interest in property" entitled to protection is "the value of the collateral" that secures such claim). According to *Timbers*, a creditor without a bona fide or unavoidable lien is not entitled to adequate protection.

7. In this case, the Debtors do not believe that M&I has a lien or a perfected lien in the Business Collateral so that M&I is not entitled to adequate protection. Even if the Court cannot determine the validity of M&I's lien in the context of this Motion, it can determine that serious questions have been raised about the validity of that lien and, based upon those questions, determine that adequate protection either is not required or is required in some minimal amount. Adequate protection is a

-11-

concept that is decidedly flexibly and must be evaluated on a case-by-case basis. *Matter of Family P'ship*, 95 B.R. 166, 171 (Bankr. E.D. Cal. 1989). The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. *In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).

8. Even if M&I has an undisputedly valid and perfected lien in the Business Collateral, M&I remains adequately protected when the Priming Lien is approved because of the substantial equity cushion that exists in the Property alone, and most certainly in the combined value of the Property and the Business Collateral. As set forth above, the Indebtedness is $12.5 million, while the value of the Property alone is about $27 million. Given that the value of the Property and the Business Collateral is $33 million, M&I enjoys an equity cushion of 64%. Adding a Priming Lien of a relatively insignificant $2 million merely reduces the cushion by a few percentage points. Even M&I admits to an equity cushion of 50%. *See* Exhibit G; s*ee also In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984) ("it has been held that the existence of an equity cushion, standing alone, can provide adequate protection"); *In re Patrician St. Joseph Ltd. P'ship*, 169 B.R. 669, 676 (D. Ariz. 1994) (quoting *Mellor* and recognizing "[A] classic method of finding adequate protection is the existence of an equity cushion").

9. As described above, the Debtors have engaged in significant efforts during the past two years to locate financing and have concluded in their sound business judgment that the DIP Financing is absolutely necessary to sustain operations and to preserve their assets and, if applicable, M&I's collateral. In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assoc.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Id.* at 513-14 (footnote omitted). The Debtors have exercised sound business judgment in determining that the DIP Financing is appropriate.

10. The proposed terms of the DIP Financing are fair, reasonable, and adequate and do not transfer any substantial control over the Debtors' bankruptcy cases to the DIP Lender, which had no prior relationship to Debtors. The purpose of the DIP Financing is to enable the Debtors to meet ongoing operational expenses and to benefit all creditors, particularly the Debtors' vendors and employees.

11. The various fees and charges required by the DIP Lender under the DIP Financing are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in § 364 of the Bankruptcy Code. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (authorizing credit arrangements under § 364, including a lender "enhancement fee"). Likewise, the proposed DIP Financing provides that the security interests and administrative expense claims granted to the DIP Lender are subject to the Carve-Out. *See In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel).

12. The Debtors believe that M&I will claim the revenue generated by the Debtors post-petition as its Cash Collateral, despite the possibility that its lien in the Business Collateral may not exist or may be avoidable if it does exist. Pursuant to Bankruptcy Code § 363(c)(2), a debtor-in-possession may use cash collateral with the consent of the secured party or upon court approval. To date, M&I has not consented to the use of its purported Cash Collateral. As such, the Debtors request authority from this Court to use the Cash Collateral to pay critical expenses such as payroll, taxes, the purchase of goods, materials, and services, and to pay other reasonable expenses as they arise in the ordinary course of business as more fully set forth on Exhibit B. Without that consent, the Debtors will be unable to operate, will be forced to liquidate, and 250 employees will lose their jobs.

13. The concept of adequate protection discussed above in the context of § 364 debtor-in-possession financing is equally applicable to a proposed use of cash collateral. As set forth above, the Debtors do not believe that M&I has a lien or an unavoidable lien in the Business Collateral.

Regardless of that belief, the equity cushion in the Property alone provides M&I with adequate protection if it is required. Likewise, if M&I has a lien in the Business Collateral, then the adequate protection provided to M&I *increases* by as much as $6.4 million. The Debtors' proposed use of the cash to sustain its operations and to preserve and replenish the assets in which M&I claims a security interest is independently sufficient to adequately protect M&I's interests. *See, e.g., In re Erie Hilton Joint Venture*, 125 B.R. 140, 149 (Bankr. W.D. Pa. 1991) ("[p]reservation of the going-concern value of the business can constitute a benefit to the secured creditor"); *In re Princeton Square Assocs.*, 201 B.R. 90, 96 (Bankr. S.D.N.Y. 1996) ("[t]his court concludes that no monetary protection is required to be provided by the debtor-in-possession to the secured creditor to the extent that the rents are applied for the maintenance of the property in the manner a receiver would apply the rents"). This protection, coupled with the protection that the equity cushion provides under any scenario, provides M&I with all of the adequate protection that it is entitled to receive under the Code.

III. CONCLUSION.

The Debtors respectfully request that the Court enter an order:

A. Setting an Interim Hearing on an emergency basis to consider entry of the Interim Order;

B. Authorizing the Debtors' use of funds claimed as cash collateral pursuant to Exhibit B;

C. Setting a Final Hearing to consider all the relief requested in the Motion on a final basis; and

D. Granting such other and further relief as the Court deems appropriate and necessary under the circumstances.

///

///

///

///

DATED this 9th day of June, 2010.

                                SCHIAN WALKER, P.L.C.

                                By /s/ CODY J. JESS, #025066
                                    Dale C. Schian
                                    Cody J. Jess
                                    Proposed Attorneys for Debtors

COPY of the foregoing
e-mailed this 9th day
of June, 2010, to:

Edward K. Bernatavicius, Esq.
U.S. Trustee's Office
230 North First Avenue, #204
Phoenix, Arizona 85003-1706
edward.k.bernatavicius@usdoj.gov

Brian Sirower, Esq.
Michael Migliaccio, Esq.
Jason Curry, Esq.
Quarles & Brady, LLP
Two North Central Avenue
Phoenix, Arizona 85004-2391
Attorneys for M&I Marshall & Ilsley Bank
brian.sirower@quarles.com
michael.migliaccio@quarles.com
jason.curry@quarles.com

Steven N. Berger, Esq.
Engelman Berger, P.C.
3636 North Central, #1200
Phoenix, Arizona 85012-1936
Attorneys for Invespro, LLC
snb@engelmanberger.com


/s/ JULIE LARSEN

140429v6